**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JASON LEOPOLD and BUZZFEED, INC., | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-3192 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 15, 17 |
| | : | | |
| UNITED STATES DEPARTMENT OF | : | | |
| JUSTICE, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT

**I. INTRODUCTION**

This case concerns Plaintiffs' request pursuant to the Freedom of Information Act

("FOIA") for a report prepared by an independent monitor evaluating a bank's anti-money

laundering and sanctions compliance policies.  In December 2012, the U.S. Attorney's Office for

the Eastern District of New York ("USAO-EDNY") and the Money Laundering and Asset

Recovery Section ("MLARS") of the Department of Justice's ("DOJ") Criminal Division filed a

criminal information charging HSBC[1] with violations of the Bank Secrecy Act.  The information

charged HSBC with failing to maintain an effective anti-money laundering program, in violation

of 31 U.S.C. § 5318(h), and failing to conduct and maintain adequate due diligence on

correspondent bank accounts held on behalf of foreign entities, in violation of 31 U.S.C. §

5318(i).  At the same time, the government filed a deferred prosecution agreement ("DPA")

---

[1] The Court uses "HSBC" to collectively refer to HSBC Holdings plc, the ultimate parent
company, HSBC North America Holdings, Inc., a subsidiary of HSBC Holdings plc, and HSBC
Bank USA, a subsidiary of HSBC North America Holdings, Inc.

between it and HSBC, which held the prosecution in abeyance for sixty months, along with a corporate monitor agreement, which specified that an independent monitor would evaluate HSBC's efforts toward reform.  The independent monitor performed similar work for the United Kingdom's Financial Conduct Authority (the "FCA") and the U.S. Board of Governors of the Federal Reserve System (the "Federal Reserve").  The independent monitor confidentially issued a thousand-page First Annual Follow-up Review Report (the "Report") in January 2015 to HSBC, the government, the FCA, and the Federal Reserve.  Plaintiffs seek the Report's disclosure.

The government withheld the Report in full pursuant to FOIA Exemptions 4, 6, 7(A), 7(C), 7(D), and 8.  Before the Court are the parties' motions for summary judgment addressing the applicability of these exemptions.  Plaintiffs argue that the government has failed to meet its burden of demonstrating the exemptions apply and that the government relies on inadmissible hearsay.  The government maintains that the submitted evidence can be reviewed and that the evidence justifies withholding the Report in full.  Based on review of the record in light of Plaintiffs' objections, and for the reasons set forth below, the Court finds that Exemptions 4 and 8 apply to the Report.  However, the Court finds that the government has not yet fulfilled its segregability obligations.  Therefore, the Court denies the government's motion for summary judgment and denies Plaintiffs' motion for summary judgment.

## II.  BACKGROUND

### A.  HSBC Prosecution

On December 11, 2012, the government filed a criminal information charging HSBC with failing to maintain an effective anti-money laundering program, in violation of 31 U.S.C. § 5318(h), and failing to conduct and maintain adequate due diligence on correspondent bank

accounts held on behalf of foreign entities, in violation of 31 U.S.C. § 5318(i).  *See United States v. HSBC Bank USA, N.A.*, No. 12-CR-763, 2013 WL 3306161, at *1 (E.D.N.Y. July 1, 2013). The information also charged HSBC with violations of the International Emergency Economic Powers Act and the Trading with the Enemy Act.  *Id.*  Alongside the information, the government filed a DPA and a corporate compliance monitor agreement.  *Id.*; *see also* DPA, *United States v. HSBC Bank USA, N.A.*, No. 12-CR-763 (E.D.N.Y. Dec. 11, 2012), ECF No. 3-2; Corporate Compliance Monitor ("Monitor Agreement"), *United States v. HSBC Bank USA, N.A.*, No. 12-CR-763 (E.D.N.Y. Dec. 11, 2012), ECF No. 3-4.[2]  Judge Gleeson accepted the government's submissions and "retain[ed] authority to ensure that the implementation of the DPA remains within the bounds of lawfulness."  *HSBC Bank*, 2013 WL 3306161, at *11.

Pursuant to the DPA, HSBC admitted responsibility for the charges and agreed to enhance its corporate anti-money laundering policies in exchange for the government's agreement to defer prosecution for five years, at which point the government would seek dismissal as long as HSBC complied with the stated conditions.  *See* DPA ¶¶ 3, 5, 14–15.  HSBC also agreed to have an independent monitor evaluate "the effectiveness of the internal controls, policies and procedures of [HSBC] . . . as they relate to HSBC['s] ongoing compliance with the Bank Secrecy Act, International Emergency Economic Powers Act, Trading with the Enemy Act and other applicable anti-money laundering laws."  Monitor Agreement ¶ 1.  The Monitor Agreement broadly provides for the independent monitor's "access to all information, documents, records, facilities and/or employees, as reasonably required by the Monitor," *id.* ¶ 2,

---

[2] The Court takes judicial notice of both the DPA and the Monitor Agreement as records of a related proceeding in another court.  *See, e.g.*, *Dupree v. Jefferson*, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981) (taking judicial notice of record in related action "pursuant to [its] authority to judicially notice related proceedings in other courts" (citations omitted)).

limited only by the attorney-client privilege or work-product doctrine, *id.* ¶ 2(b).  The agreement further calls for preparation of annual reviews and reports detailing the findings of the independent monitor and proposing recommendations to improve the effectiveness of HSBC's compliance programs.  *Id.* ¶¶ 3–4.  The agreement requires the independent monitor to provide the reports "to the Board of Directors of HSBC Holdings and contemporaneously transmit copies to [MLARS], the [Federal Reserve], and the [FCA]."  *Id.* ¶ 4.  The Monitor Agreement also stated that the reports "will likely include proprietary, financial, confidential, and competitive business information" and that "public disclosure of the reports could discourage cooperation, impede pending or potential government investigations."  *Id.* ¶ 9.  As such, the agreement indicated that "the reports and the contents thereof are intended to remain and shall remain non-public," unless the parties agreed otherwise, or the government determined that the law required disclosure.  *Id.*

By the terms of the DPA and Monitor Agreement, Michael Cherkasky was selected to serve as the independent monitor.  Gov't Statement of Undisputed Material Facts ("Gov't Statement of Facts") ¶ 6, ECF No. 15-2; Pls.' Resp. to Gov't Statement of Facts ¶ 6, ECF No. 17-3; Kessler Decl. Ex. A at 15–17, Aff. of Michael G. Cherkasky ("Cherkasky Aff.") ¶ 2, ECF No. 15-8.[3]  Mr. Cherkasky also served as an independent consultant pursuant to a related cease and desist order issued by the Federal Reserve against HSBC that also charged the bank with violating money laundering and sanctions laws.  Cherkasky Aff. ¶ 2.

---

[3] As explained below, the Court considers the substance of Mr. Cherkasky's affidavit despite Plaintiffs' hearsay objections.

### B.  The Report

In January 2015, Mr. Cherkasky issued the Report at issue in this case.  *Id.* ¶ 4.  The

Report sets forth his "findings and assessment" of HSBC's anti-money laundering and sanctions

compliance program and details HSBC's "progress over the course of the preceding year in

improving its [anti-money laundering] and sanctions compliance program."  *Id.*  Mr. Cherkasky

based the Report "on independent testing conducted by [himself] and by the [anti-money

laundering] and sanctions compliance professionals who supported [him] in [his] role as

Monitor."  *Id.*  As part of his role in preparing the Report, and other reports under the Monitor

Agreement, Mr. Cherkasky worked with regulators around the world to gain access to

"confidential client information" under the "presumption of confidentiality."  *Id.* ¶ 9.  Mr.

Cherkasky also relied "on full, open, and candid cooperation from employees at all levels of

[HSBC]."  *Id.* ¶ 11.  The Report "identifies significant, current deficiencies in [HSBC's] [anti-

money laundering] and sanctions compliance program."  *Id.* ¶ 12.

The Report is further described in a letter penned by HSBC's counsel, Benjamin Naftalis.

*See* Naftalis Decl. Ex. A, ECF No. 20-2.  Mr. Naftalis states that the Report documents

"extensive findings in relation to HSBC's anti-money laundering and sanctions compliance

around the world" and "contains the Monitor's analysis of confidential client information."  *Id.* at

3.  He states that "HSBC provided this sensitive banking information to the Monitor based on the

express assurance that this information would remain confidential."  *Id.*  Mr. Naftalis says that

the Report "is no different from bank supervisory and examination reports prepared by financial

regulators to supervise compliance and assess potential weaknesses."  *Id.*  Furthermore, the

"Report details HSBC's practices with respect to investigating and filing suspicious activity

reports" and "also provides extensive detail about HSBC's sensitive proprietary information used in combatting financial crime." *Id.*

### C.  Judge Gleeson's Order and Second Circuit Opinion

In January 2016, Judge Gleeson considered a motion by a third party to unseal the Report.  *See United States v. HSBC Bank USA, N.A.*, No. 12-CR-763, 2016 WL 347670 (E.D.N.Y. Jan. 28, 2016), *rev'd*, 863 F.3d 125 (2d Cir. 2017).  Because he retained jurisdiction over the case and he believed he would eventually need to decide whether dismissal is appropriate, Judge Gleeson determined that the Report "is [] directly relevant to [his] judicial function, and as a result falls squarely within the definition of a judicial document." *Id.* at 4.  He concluded that the Report was subject to a First Amendment right of access and thus should be released with redactions.  *Id.* at 4–7.

Judge Gleeson considered four interests advanced by the government and HSBC in keeping the Report sealed.  First, he considered whether public release would create a "potential chilling effect" among HSBC employees that would undermine Mr. Cherkasky's work.  *Id.* at 5. He concluded, however, that this concern could be addressed by redacting identifying information about HSBC employees.  *Id.*  Second, he considered the argument that release of the Report would give criminals a "road map" to exploit weaknesses in HSBC's compliance programs but found that "much of the information is generalized or would likely be otherwise unhelpful to a would-be money launderer" and that any potential issues could also be addressed with redactions.  *Id.* at 6.  Third, Judge Gleeson found that public release of the Report would not negatively impact the government's ability to use independent monitors in future cases.  *See id.* Finally, Judge Gleeson determined that Mr. Cherkasky's relationship with foreign regulators could be adequately protected with redactions and by keeping a number of the Report's

appendices under seal.  *Id.*  Judge Gleeson concluded that the Report contained information that the public had a right to see and ordered the parties to submit proposed redactions.  *See id.* at 6–7.  Judge Gleeson weighed the appropriateness of the proposed redactions and determined which should apply, but he kept the entire Report under seal pending appellate review.  *See United States v. HSBC Bank USA, N.A.*, No. 12-CR-763 (E.D.N.Y. Mar. 9, 2016), ECF No. 70.  He determined that all the redactions proposed by the government appropriately applied but found "HSBC's proposed redactions to be over-inclusive," *id.* at 2, specifically the proposals relating to commercially sensitive or proprietary bank information, *see id.* at 3.

The government appealed Judge Gleeson's ruling and the Second Circuit reversed.  *See United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017).  The Second Circuit determined that the Report is not a judicial document subject to an order to unseal.  *Id.* at 142. The Second Circuit found that the district court "has no freestanding supervisory power to monitor the implementation of a DPA," *id.* at 137, and that the Report would not necessarily be relevant in resolving a Rule 48(a) motion to dismiss the information at the end of the DPA's term, *id.* at 141.  The court did not address Judge Gleeson's analysis of the purported reasons to keep the Report under seal.  Finally, in a footnote, the court stated that "'[t]he appropriate device' for obtaining executive records 'is a Freedom of Information Act request addressed to the relevant agency.'"  *Id.* at 142 n.7 (quoting *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997)).  The court "offer[ed] no view on whether any of FOIA's exemptions would apply."  *Id.*

### D.  The Present Case

In July 2019, Plaintiffs submitted a FOIA request with the Executive Office of the United States Attorneys ("EOUSA") seeking the Report.  Gov't Statement of Facts ¶ 14; Pls.' Resp. to

Gov't Statement of Facts ¶ 14; *see also* Compl. Ex. A, ECF No. 1-1.  The USAO-EDNY conducted a search for responsive records and located the Report.  Gov't Statement of Facts ¶ 17; Pls.' Resp. to Gov't Statement of Facts ¶ 17.[4]  The government informed Plaintiffs that the Report was subject to withholding under FOIA Exemptions 4, 6, 7(A), 7(C), 7(D), and 8.  Gov't Statement of Facts ¶ 18; Pls.' Resp. to Gov't Statement of Facts ¶ 18.  Plaintiffs then filed suit to challenge the government's claim of exemptions.  *See* Compl., ECF No. 1.  The parties have each moved for summary judgment.  *See* Gov't Mem. Supp. Mot. Summ. J. ("Gov't Mem."), ECF No. 15-1; Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem."), ECF No. 17-1.

In support of its motion, the government filed four declarations.  *See* Jolly Decl., ECF No. 15-3; Kessler Decl., ECF No. 15-7; Moeser Decl., ECF No. 10; Naftalis Decl., ECF No. 20-2.  Attached to the declaration of David Kessler are a number of letters that the government submitted for consideration by Judge Gleeson.  *See* Kessler Decl. Ex. A, ECF No. 15-8.  The declarations and letters speak to the applicability of the various FOIA exemptions claimed by the government.  The parties' motions for summary judgment are fully briefed and ripe for decision.

## III.  LEGAL STANDARD

The purpose of FOIA "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA requests thus provide individuals with the opportunity to obtain access to federal agency records, except to the extent that such records are protected from public disclosure by one of nine exemptions.  *See* 5 U.S.C. § 552(a)(3), (a)(4)(B), (b), (c); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S.

---

[4] Because the government successfully located the requested Report, there is no dispute about the adequacy of the government's search for records.

132, 136 (1975); *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Alyeska

Pipeline Serv. Co. v. U.S. EPA*, 856 F.2d 309, 314 (D.C. Cir. 1988) (concluding that

unsubstantiated claims of factual controversies cannot defeat a summary judgment decision in a

FOIA case). FOIA cases are typically resolved through summary judgment because in FOIA

cases there is rarely any factual dispute, instead, these cases center on how the law is applied to

the records at issue. *See Pinson v. U.S. Dep't of Justice*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017)

(quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)) ("FOIA

cases typically and appropriately are decided on motions for summary judgment."); *see also

Gray v. Southwest Airlines Inc.*, 33 Fed. Appx. 865, 868 n.1 (9th Cir. 2002) (citing *Schiffer v.

FBI*, 78 F.3d 1405, 1409 (9th Cir. 1996)). Accordingly, in a FOIA suit, summary judgment is

appropriate "if no material facts are genuinely in dispute and the agency demonstrates 'that its

search for responsive records was adequate, that any exemptions claimed actually apply, and that

any reasonably segregable non-exempt parts of records have been disclosed after redaction of

exempt information.'" *Prop. of the People, Inc. v. Off. of Mgmt. and Budget*, 330 F. Supp. 3d

373, 380 (D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181

(D.D.C. 2017)).

     In a FOIA suit, the court shall determine a motion for summary judgment *de novo*. *See* 5

U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. Internal Revenue Serv.*, 915 F. Supp. 2d

174, 179 (D.D.C. 2013). Therefore, when assessing non-disclosure decisions in a FOIA action,

the court may solely rely on "affidavits or declarations if they describe 'the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Life Extension Found.*, 915 F. Supp. 2d at 179 (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Pronin v. Fed. Bureau of Prisons*, No. 17-cv-1807, 2019 WL 1003598, at *3 (D.D.C. Mar. 1, 2019). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. Cent. Intel. Agency*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Judicial Watch*, *Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (internal citations omitted)). However, exemptions are to be "narrowly construed." *Bloche v. Dep't of Defense*, 370 F. Supp. 3d 40, 50 (D.D.C. 2019) (quoting *Morley v. Cent. Intel. Agency*, 508 F.3d 1108, 1115 (D.C. Cir. 2007)). Accordingly, an agency must do more than provide "summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C 2013) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)).

## IV.  ANALYSIS

The government relies on a number of FOIA exemptions to withhold the Report in full. Because Exemption 4 and Exemption 8 have the broadest sweep, the Court limits its discussion to those two exemptions. Before turning to the claimed exemptions, the Court considers Plaintiffs' claim that the government primarily relies on inadmissible hearsay to establish the applicability of the FOIA exemptions. After discussing Exemptions 4 and 8, the Court concludes by discussing segregability.

## A.  Hearsay Objections

Hearsay, defined as a statement not made while testifying in court offered "to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c), is generally not admissible at trial, Fed. R. Evid. 802.  The Federal Rules of Evidence outline a number of exceptions to the hearsay rule.  *See* Fed. R. Evid. 803.  In addition to the enumerated exceptions, hearsay that "is supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts" is admissible under the residual hearsay exception.  Fed. R. Evid. 807.  Despite the general inadmissibility of hearsay, "courts may consider hearsay in FOIA cases when assessing the adequacy of the agency's search" and "FOIA declarants may rely on information obtained through inter-agency consultation."  *Humane Soc'y of United States v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019).  Furthermore, "it is well settled that 'FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties.'"  *Hainey v. U.S. Dep't of the Interior*, 925 F. Supp. 2d 34, 41 (D.D.C. 2013) (quoting *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 19 (D.D.C. 2009)).  However, "it is a different matter to rely on out-of-court statements from private third-parties to justify an agency's withholding."  *Humane Soc'y*, 386 F. Supp. 3d at 44.  Nevertheless, when considering a motion for summary judgment under Rule 56, parties may rely on "affidavits or declarations" to establish that a fact cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1)(A); *see also Smith v. Holland LP*, No. 16-cv-2242, 2019 WL 1228079, at *3 (D.D.C. Mar. 15, 2019) (allowing consideration of deposition testimony taken pursuant to a different case).

Plaintiffs argue that "the facts relied on by the government to establish its exemption claims overwhelmingly rely on letters written by lawyers for HSBC."  Pls.' Mem. at 3.[5] Plaintiffs contend that because these "unsworn letters" are "out of court statements offered for the truth of the matter asserted," and because the government does not identify an applicable hearsay exception, the Court should not consider the evidence.  *Id.*  The government responds by first arguing that the letters are not hearsay because they merely consist of the objections of the various submitters and, thus, constitute "performative utterances."  Gov't Reply at 2, ECF No. 20.  The government then argues that if the letters are hearsay, the Court should apply the residual hearsay exception.  *Id.* at 3–5.  The government contends that because Plaintiffs offer no reason to call into question the reliability of the evidence and the circumstances suggest trustworthiness, any hearsay statements contained in the letters should be admitted.  *Id.* at 3 (citing Fed. R. Evid. 807(a)).  The government also argues that the Court can take judicial notice of the letters because they appear on the public docket in the case before Judge Gleeson.  *Id.* at 4. Finally, the government opted to submit an additional declaration, signed by counsel for HSBC, that attests to the accuracy of the statements contained in one of the contested letters.  *See* Naftalis Decl.

The Court first reiterates that declarations submitted by agency personnel are appropriately considered on a motion for summary judgment in a FOIA case, as long as they satisfy the personal knowledge requirement of Rule 56.  The declaration of Vinay J. Jolly, an Attorney Advisor with the EOUSA, attests that the contents of the declaration "are based upon [his] review of the official files and records of EOUSA, [his] own personal knowledge, and

---

[5] The Court understands Plaintiffs to also object to letters written by the Federal Reserve, the FCA, the Hong Kong Monetary Authority, and Bank Negara Malaysia.  *See* Kessler Decl. Ex. A.

information acquired by [him] through performance of [his] official duties."  Jolly Decl. ¶ 2.

The declaration of Margaret A. Moeser, the Deputy Chief of the Bank Integrity Unit ("BIU") of

MLARS, states:

> I make this declaration based on my experience in the BIU, including working with
> and selecting monitors, investigating and prosecuting criminal cases, reviewing
> documents obtained during the DOJ's investigation of HSBC, conversations with
> other attorneys at the Department, including attorneys who were involved with the
> monitor imposed as part of HSBC's deferred prosecution agreement with the
> Department, and my review of court filings and information from the monitorship
> related to the Department's deferred prosecution agreement with HSBC.

Moeser Decl. ¶ 2.  The declaration of Benjamin Naftalis, although not a declaration of agency

personnel, states, "under penalty of perjury," that he represents HSBC, is a "member in good

standing of the bar of the State of New York," and that "the contents of [the attached July 14,

2020 letter] are accurate and correct."  Naftalis Decl. ¶¶ 1–2.  Based on these statements, the

Court is satisfied that the Jolly Declaration, the Moeser Declaration, and the Naftalis

Declaration[6] meet the requirement under Rule 56 that a declaration "must be made on personal

knowledge."  Fed. R. Civ. P. 56(c)(4).[7]

The Court also will consider the affidavit of Mr. Cherkasky, which appears on the public

docket before Judge Gleeson and which the government submitted in support of their motion.

*See* Cherkasky Aff.  Plaintiffs do not articulate why Mr. Cherkasky's affidavit, made upon

---

[6] The declaration submitted by David K. Kessler contains no such assurance that the
statements made are based on personal knowledge.  In fact, after describing the search for the
Report, his declaration goes on to quote extensively from the attached letters submitted in the
underlying criminal case.  *See* Kessler Decl. ¶¶ 4–7.  For that reason, the Court is doubtful that
the Kessler Declaration satisfies Rule 56(c)(4).  However, because the adequacy of the search is
not at issue and the factual assertions made in his declaration are established through the other
declarations, this deficiency does not affect the outcome of the case.

[7] That the declarations satisfy the personal knowledge requirement does not necessarily
mean that they do not include inadmissible hearsay.  The Court does not consider the portions of
the declarations that merely quote from the letters the Court has determined are inadmissible.

"being duly sworn," *id.*, cannot properly be considered in support of the government's motion. Mr. Cherkasky's affidavit confirms that he has "served as the independent corporate compliance monitor" under the DPA and that he authored the Report that "set forth [his] findings and assessment of the then-current state of HSBC['s]" compliance programs.  *Id.* ¶¶ 1, 3.  Plaintiffs' blanket objection to the "unsworn letters" submitted by the government plainly does not apply to Mr. Cherkasky's sworn affidavit.  *See* Pls.' Mem. at 3.  The Court finds that the affidavit is "made on personal knowledge," Fed. R. C. P. 56(c)(4), and will therefore consider it when evaluating the government's claimed exemptions.

The other materials, which include the letters submitted in the case before Judge Gleeson by DOJ, the Federal Reserve, and FCA, will not be considered.  *See* Kessler Decl. Ex. A.  Each letter is a statement made out of court and the government has not established the applicability of any hearsay exception.  *See Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (refusing to consider inadmissible hearsay on motion for summary judgment).  While the letters may contain certain guarantees of trustworthiness, given that they were submitted by government agencies for a criminal case pending before a federal judge, the government has not established that the letters are "more probative on the point for which [they are] offered than any other evidence that the [government] can obtain through reasonable efforts," as required by the residual hearsay exception.  Fed. R. Evid. 807(a)(2).  The government could have, and probably should have, obtained sworn declarations from these agencies to support the claimed exemptions—such efforts would have been reasonable.  The Court also fails to understand the relevance of the letters if they are not offered for the truth of the matter asserted.  The government must prove the applicability of its claimed exemptions with facts— performative utterances, which the government acknowledges have no truth value, *see* Gov't

Mem. at 2, cannot help the government's case.  Moreover, the fact that the letters appear on a public docket does not automatically convert them into admissible evidence or into facts subject to judicial notice.  Courts take judicial notice of facts capable of accurate and ready determination that are "straightforward and easy to ascertain."  *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 16 (D.D.C. 2001).  The facts contained in the letters are not of such a character.  Accordingly, the Court will only consider the Jolly Declaration, the Moeser Declaration, the Naftalis Declaration, and the Cherkasky Affidavit to evaluate the applicability of the claimed exemptions.

### B.  Exemption 4

FOIA Exemption 4 exempts from disclosure "commercial or financial information obtained from a person" that is "privileged or confidential."  5 U.S.C. § 552(b)(4).  To properly apply this exemption, the agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  The terms "'commercial' and 'financial' in the exemption should be given their ordinary meanings."  *Id.*  Information is confidential for the purpose of Exemption 4 "when it is 'both customarily and actually treated as private by its owner,' and perhaps as well, 'provided to the government under an assurance of privacy.'"  *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019)).[8]  Upon

---

[8] The court in *Investigative Reporting* determined, and this Court agrees, that after *Food Marketing*, the framework provided by the D.C. Circuit's opinion in *Critical Mass Energy Project* determines whether commercial and financial information is confidential regardless of whether it is submitted voluntarily or involuntarily.  *Investigative Reporting*, 436 F. Supp. 3d at 109 (citing *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879–80 (D.C. Cir. 1992) (en banc)).

showing that the elements of Exemption 4 apply, the agency must also "explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as causing 'genuine harm to [the third party's] economic or business interests.'"  *Id.* at 113 (quoting *Food Marketing*, 139 S. Ct. at 2369).

### 1.  Application of Exemption 4

The government argues that the Report contains sensitive commercial and financial information that was provided under express assurances of confidentiality.  Gov't Mem. at 10–11.  Citing both *Investigative Reporting* and *Food Marketing*, the government argues that the applicability of Exemption 4 is clearly established in light of the government's declarations and the letter penned by Mr. Naftalis.  *See id.* at 10–13.  Plaintiffs point to Judge Gleeson's decision to suggest that the confidential information could be protected through redactions and also argues that the government has failed to establish with specificity the foreseeable harm that would result from disclosure.  Pls.' Mem. at 4–5.  Plaintiffs, however, agree that if the submitted materials are considered, they do "indicate that the [R]eport includes information that HSBC customarily keeps private and that the government told HSBC that it would keep confidential." *Id.* at 4.

The Court finds that Exemption 4 applies to the Report.  The Naftalis Declaration establishes the elements of Exemption 4.  The Report "contains extensive proprietary, financial, and competitive business information about HSBC and its customers."  Naftalis Decl. Ex. A at 1. The "proprietary, confidential, and competitive business information" included in the Report "has traditionally been kept secret for the benefit of banks, customers and regulators alike."  *Id.* at 2.  The Report contains detailed "findings in relation to HSBC's anti-money laundering and sanctions compliance around the world."  *Id.* at 3.  Importantly, "HSBC provided this sensitive

banking information to the Monitor based on the express assurance that this information would remain confidential." *Id.*  Indeed, the Monitor Agreement stated that the reports prepared by the monitor "will likely include proprietary, financial, confidential, and competitive business information" and that "the reports and the contents thereof are intended to remain and shall remain non-public."  Monitor Agreement ¶ 9.  The Court finds that the government has established that the Report contains financial and commercial information that is "customarily and actually treated as private" and that the information was provided to the government under the assurance of confidentiality.  *Investigative Reporting*, 436 F. Supp. 3d at 112 (quoting *Food Marketing*, 139 S. Ct. at 2369).

With respect to what harm would result from disclosure, the Naftalis Declaration states that "[t]he Report also provides extensive detail about HSBC's sensitive proprietary information used in combatting financial crime" and "information about the Bank's technology infrastructure, which is used to identify and analyze financial crime as well as the Bank's bespoke policies and procedures."  Naftalis Decl. Ex. A at 3–4.  "The release of this information could disadvantage HSBC and provide an unfair advantage to its competitors."  *Id.* at 4.  Furthermore, the submitted materials explain how public release of the confidential information would dissuade HSBC and others from cooperating with the government in the future.  *See id*.; Cherkasky Aff. ¶ 11 ("releasing this report publicly would have a chilling effect on [HSBC] employees, and the level of cooperation and candor I would receive could decrease substantially"); Moeser Decl. ¶ 11 ("the release of such information would likely deter other [financial institutions] from entering into DPAs including monitors in the future, thus jeopardizing an important tool that DOJ uses").  Plaintiffs argue that this language is not specific enough and point to *Investigative Reporting* as requiring more with respect to foreseeable harm.

But the court in *Investigative Reporting* explicitly recognized that Exemption 4 protects against the kind of harm described in the government's submission. *See* 436 F. Supp. 3d at 113 (finding that to establish foreseeable harm, the government "must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing genuine harm to [the submitter's] economic or business interests, and thereby dissuading others from submitting similar information to the government" (internal quotation and citation omitted)). Accordingly, the Court finds that the government has established the elements of Exemption 4.[9]

### C.  Exemption 8

Exemption 8 applies to matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation of financial institutions." 5 U.S.C. § 552(b)(8). Given the statutory language, the D.C. Circuit "has explained time and again that Exemption 8's scope is 'particularly broad.'" *Pub. Invs. Arb. Bar Ass'n v. S.E.C.*, 771 F.3d 1, 4 (D.C. Cir. 2014) (quoting *Consumers Union of United States, Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978)). In particular, "the 'related to' language casts a wide net of non-disclosure over any documents that are logically connected to an 'examination, operating, or condition report[].'" *Pub. Invs. Arb. Bar Ass'n v. U.S. S.E.C.*, 930 F. Supp. 2d 55, 62–63 (D.D.C. 2013), *aff'd sub nom. Pub. Invs. Arb.*, 771 F.3d 1. "Exemption 8 extends to any documents received by a financial regulatory agency in the course of exercising its 'regulatory responsibilities in relation to the financial institutions whose information has been withheld.'" *Id.* (quoting *McKinley v. FDIC*, 744 F. Supp. 2d 128, 144

---

[9] Plaintiffs' final argument with respect to Exemption 4—that the government's and HSBC's concerns can be adequately addressed through redactions—is addressed below in the Court's discussion of segregability.

(D.D.C. 2010)).  Pursuant to Exemption 8, "examination reports need not pertain to an institution that is regulated or supervised by the withholding agency." *Pub. Citizen v. Farm Credit Admin.*, 938 F.2d 290, 294 (D.C. Cir. 1991).  Because through the statutory language "Congress has intentionally and unambiguously crafted a particularly broad, all-inclusive definition," the D.C. Circuit has determined that "it is not [the Court's] function, even in the FOIA context, to subvert that effort." *Heimann*, 589 F.2d at 533; *see also McKinley*, 744 F. Supp. 2d at 143 ("Although generally FOIA exemptions are to be 'narrowly construed,' it is well-established that Exemption 8's scope is 'particularly broad.'" (citations omitted)).

Beyond the broad statutory language, the D.C. Circuit has identified two legislative purposes behind Exemption 8.  First, "the primary reason for adoption of exemption 8 was to ensure the security of financial institutions." *Heimann*, 585 F.2d at 534.  This reason speaks to a "concern that disclosure of examination, operation, and condition reports containing frank evaluations of the investigated banks might undermine public confidence and cause unwarranted runs on banks." *Id.*  The second legislative purpose of Exemption 8 was to "safeguard the relationship between the banks and their supervising agencies." *Id.*  "If the details of the bank examinations were made freely available to the public and banking competitors, there was concern that banks would cooperate less than fully with federal authorities." *Id.*; *see also Bloomberg, L.P. v. S.E.C.*, 357 F. Supp. 2d 156, 170 (D.D.C. 2004) ("[T]he purpose of [Exemption 8] is . . . to ensure that [financial] institutions continue to cooperate with regulatory agencies without fear that their confidential information will be disclosed.").

### 1.  Application of Exemption 8

The government argues that the Report "falls squarely within the parameters of Exemption 8." Gov't Mem. at 23.  Because the Report details HSBC's compliance with anti-

money laundering and sanctions laws, and the remedial measures suggested by Mr. Cherkasky, the government claims that it should be covered by Exemption 8. *See id.* The government also points out that Mr. Cherkasky "served a similar role for the FCA and Federal Reserve," two organizations responsible for regulatory oversight of HSCB. *Id.* In response, Plaintiffs craft a textual argument suggesting that in order for Exemption 8 to apply, the government must prove that the Report was "prepared by, on behalf of, or for the use of" the Federal Reserve. Pls.' Mem. at 8. Plaintiffs claim that the government's evidence is too vague and that "the government is bootstrapping a limited involvement of the Federal Reserve to keep the entire report secret under Exemption 8." *Id.* at 9.

The broad scope of Exemption 8's text covers the Report. Plaintiffs fail to appreciate the implications of the "related to" portion of Exemption 8, choosing instead to focus on the second half of the exemption. *See* Pls.' Reply at 7, ECF No. 23. The Court finds that the government's submission makes clear that, at the very least, the Report contains information "related to examination, operating, or condition reports" prepared by, on behalf of, or for the use of the Federal Reserve. Mr. Cherkasky's affidavit states that, pursuant to a Federal Reserve cease and desist order related to the DPA, HSBC "appointed [him] as an Independent Consultant to perform certain tasks" required by the Federal Reserve's order. Cherkasky Aff. ¶ 2. The Federal Reserve's cease and desist order "concluded that [HSBC] had engaged in conduct that violated the money laundering and sanctions laws of the U.S." *Id.* Corroborating Mr. Cherkasky's affidavit, the Naftalis Declaration confirms that HSBC entered into a resolution with the Federal Reserve at the same time as the DPA. Naftalis Decl. Ex. A at 1; *see also* Moeser Decl. ¶ 14 ("In addition to serving as Monitor under the DPA, the Monitor performed a similar role for the [FCA] and the [Federal Reserve], which were parties to regulatory actions undertaken against

HSBC for the same underlying conduct.").  The Naftalis Declaration also states that "the Report is no different from bank supervisory and examination reports prepared by financial regulators to supervise compliance and assess potential weaknesses."  Naftalis Decl. Ex. A at 3.  Plaintiffs complain that this evidence is too vague.  Pls.' Mem. at 8.  The evidence shows, however, that Mr. Cherkasky conducted review and oversight of HSBC's anti-money laundering and sanctions compliance programs under the DPA and that he performed a similar role for the Federal Reserve.  Even if the government's evidence can be described as vague, given the broad scope of Exemption 8, which protects information that is merely related to compliance reports prepared by regulatory agencies, the Court finds that the government appropriately applied the exemption.

Moreover, the government's submission shows that the underlying purposes of Exemption 8 are served by its application here.  According to Mr. Cherkasky, the Report "identifies significant, current deficiencies in HSBC['s] [anti-money laundering] and sanctions compliance program."  Cherkasky Aff. ¶ 12.  Public disclosure of such deficiencies could "undermine public confidence" in the bank.  *Heimann*, 585 F.2d at 534.  More on point, however, is the second legislative purpose—to "safeguard the relationship between the banks and their supervising agencies."  *Id.*  The Moeser Declaration explains that confidentiality is "the crux of a successful monitorship" because without it, "domestic and foreign [financial institution] regulators, [financial institution] employees, and others upon whom the monitors rely may be unwilling to cooperate with the monitor."  Moeser Decl. ¶¶ 9–10.  Mr. Cherkasky maintains that to effectively monitor bank compliance programs, he should have access to confidential client information.  Cherkasky Aff. ¶ 8.  Furthermore, bank participation depends on "full, open, and candid cooperation from employees at all levels of [HSBC]."  *Id.* ¶ 11.  Such cooperation is maintained through confidentiality of communication.  The Naftalis Declaration

corroborates this evidence by comparing the Report to bank supervisory and examination reports

subject to the bank examination privilege, which "provides a critical safeguard by facilitating

open and candid communications between examiners and regulated organizations about potential

weaknesses and vulnerabilities." Naftalis Decl. Ex. A at 3.  This evidence showing that

regulatory effectiveness would be undermined by public release of the Report also speaks to the

foreseeable harm.  *See Investigative Reporting*, 436 F. Supp. 3d at 113.  Accordingly, the Court

finds that the withholding of the Report logically and plausibly falls within the broad textual

scope of Exemption 8 and the legislative purposes identified by the D.C. Circuit.

### D.  Segregability

FOIA requires an agency invoking an exemption to disclose any reasonably segregable,

non-exempt information.  *See Prop. of the People, Inc.*, 330 F. Supp. 3d at 380 (quoting

*Competitive Enter. Inst.*, 232 F. Supp. 3d at 181); *see also* 5 U.S.C. § 552(b).  "To meet its

burden on segregability, a government agency must usually submit a sufficiently detailed

*Vaughn* Index for each document and an affidavit or declaration stating that it has released all

segregable material."  *Bloche*, 370 F. Supp. 3d at 55 (internal citations omitted).  "Agencies are

entitled to a presumption that they complied with the obligation to disclose reasonably

segregable material," but the presumption can be overcome by presenting evidence to the

contrary.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116–17 (D.C. Cir. 2007).

The government's submission[10] contains the following statement on segregability:

> The document was evaluated to determine if any information could be segregated
> and released.  The Report falls within one or more of the exemptions set forth above
> and are not segregable without revealing this protected information.  The Report,

---

[10] The Naftalis Declaration states that "any possible non-exempt portions [of the Report] are inextricably intertwined with confidential information and other portions exempt from disclosure."  Naftalis Decl. Ex. A at 4.  This declaration, however, is not one made by a government employee responsible for making segregability determinations.

> withheld in its entirety, contained no meaningful portion that could be released
> without destroying the integrity of the document or without disclosing third-party
> privacy interests.

Jolly Decl. ¶ 26.  Plaintiffs point to Judge Gleeson's opinion as evidence that the privacy

interests implicated under Exemption 4 and the information protected by Exemption 8, in

addition to the information covered by other exemptions, can be adequately protected through

redactions.  *See* Pls.' Mem. at 4–5, 9.  The Court notes, however, that Judge Gleeson did not

evaluate the applicability of any FOIA exemptions or make any finding with respect to

segregability pursuant to FOIA.  Nevertheless, the Court appreciates Plaintiffs' point.  The

government's segregability statement is particularly brief given the length of the Report, Judge

Gleeson's findings that suggest that many concerns with disclosure could be addressed through

redactions, *see HSBC Bank*, 2016 WL 347670, at *4–7, and his finding that HSBC's proposed

redactions regarding commercially sensitive information were over-inclusive, *see United States*

*v. HSBC Bank USA, N.A.*, No. 12-CR-763 (E.D.N.Y. Mar. 9, 2016), ECF No. 70.  As such, in

light of the Court's findings with respect to Exemptions 4 and 8 and Judge Gleeson's opinion,

the government shall conduct a line-by-line review of the report to determine whether any

information can be reasonably segregated and released.[11]  The government must, at minimum,

provide greater detail on the basis for withholding the specific portions of the Report that Judge

---

[11] Given the nature of the monitorship, which depended on access to confidential
financial and commercial information, and the broad scope of Exemption 8, the Court is unsure
whether any non-exempt information can be reasonably segregated.  But the government must
fulfill its "obligation to show with reasonable specificity that a document cannot be further
segregated."  *James Madison Project v. Dep't of Treasury*, No. 19-cv-2461, 2020 WL 4698435,
at *6 (D.D.C. Aug. 13, 2020) (citing *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–
79 (D.C. Cir. 1996)).  So far, in light of Plaintiffs' objections, the government has not fulfilled
that obligation.

Gleeson concluded were appropriate for release to the public.  This Court may conduct its own *in camera* review to assure itself of the basis for such withholding.[12]

## V.  CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (ECF No. 15) is **DENIED** and Plaintiffs' motion for summary judgment (ECF No. 17) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  January 13, 2021                                RUDOLPH CONTRERAS
                                                        United States District Judge

---

[12] As noted above, the Court limited its discussion to Exemptions 4 and 8 because of their broad sweep.  That said, when the government conducts the line-by-line review of the Report for segregable material, it may also rely on the other FOIA Exemptions it had previously asserted but that the Court did not discuss.  But if the government continues to rely on FOIA Exemption 7(A), it must provide the Court with additional information regarding any enforcement proceedings and the basis for its withholding on those grounds.  Such additional information may be filed *ex parte* and under seal, as requested by the government, if necessary.  *See* Gov't Mem. at 16.